**SHRADER et al. v. REED et al.**

Civ. A. 12–51.

United States District Court
D. Nebraska, Omaha Division.

Sept. 2, 1952.

David W. Swarr, of Omaha, Neb., and Thomas E. Scofield, of Kansas City, Mo., for the plaintiffs.

Theodore L. Richling, of Omaha, Neb., and Andrew F. Wintercorn, of Rockford, Ill., for the defendant.

DELEHANT, District Judge.

The plaintiffs, citizens of Nebraska, as the owners of letters patent numbered respectively 2,490,715, (referred to herein as Shrader Patent "A") and 2,534,685, (referred to herein as Shrader Patent "B") originally issued, the former on December 6, 1949 to Shrader, the latter on December 19, 1950 to both plaintiffs, and said to cover inventions respectively for a "corn harvesting mechanism", and for "Corn Snapping Rolls", brought this action against the defendant, a Nebraska retail implement dealer. In their complaint they set up the patents, their ownership, their infringement by the defendant through the sale of devices embodying their alleged inventions, and the giving of statutory notices both on products manufactured within the patents and of infringement, and prayed for injunctive relief, an accounting, for damages, and costs and attorneys fees.

Answering, the defendant admitted the issuance of the two patents and notice to him of their claimed infringement by him, but denied the validity of either of them for want of invention in the face of sundry cited earlier patents, several specified prior uses, publications and sales, and prior art, as also for failure to point out the claimed inventions, denied infringement, and prayed for dismissal and the recovery of his costs. The accused device was merely sold by the defendant and was manufactured by L. H. Schultz Manufacturing Company of Rochelle, Illinois, herein called the "Schultz Company".

Trial of the action has been had, save upon the issue of an accounting, which was reserved pending the determination of the underlying questions of the validity of the plaintiffs' patents and of the defendant's alleged infringement. Counsel have assisted the court in its work by the submission of comprehensive briefs. The record before the court tenders for present answer only the validity of the patents relied upon and, if that be affirmed, the alleged infringement. Such other questions as were

made by the pleadings seem not to have been carried forward by the evidence.

██ Upon careful consideration of the entire record, including an inspection of physical exhibits and a study of the several patents of the plaintiffs, along with the prior patents resorted to by the defendant, the court is satisfied, and finds, that the plaintiffs' patents are invalid for want of invention in the light of the earlier patents advanced against them.

At what seems to be a more appropriate place, the court will later in this memorandum set out very briefly and summarily the course of work and experimentation by which Shrader arrived at the point of initiating his several patent proceedings. To the extent of their pertinence to the validity of the patents which he ultimately obtained, that material may also be considered at this point in the opinion.

The claims in Shrader Patent "A"[1] and Shrader Patent "B"[2] are respectively set out in separate footnotes. Diluted in respect of their "patentese" ingredient, and translated into reasonably conventional

---

1. Claims of Shrader patent "A":

"1. In a corn picker having a cornstalk receiving passage extending rearwardly from the forward end thereof, the combination comprising a first elongated roll and disposed in said passage and substantially disposed in alignment with the direction of travel of said cornpicker, said roll having at least one helically disposed ridge secured to its perimeter and extending along said roll to a point spaced from the rearward end thereof; a plurality of radially equidistantly spaced apart elongated lugs disposed about the perimeter of said roll and between said ridge and said rearward end, said lugs being longitudinally disposed with respect to said roll; a second roll disposed alongside said first roll, said second roll being similarly constructed to said first roll with an exception in that the helical ridge of said second roll winds in an opposite direction to the ridge of said first roll, said ridges on said rolls being disposed terminating in such positions that that leading edge of each ridge which is disposed in the direction of rotation of its corresponding roll is disposed between two adjacent ones of said lugs, said rolls being so disposed with respect to each other that their oppositely winding ridges tend to urge cornstalks rearwardly of said rolls in operation and at times when said rolls are caused to rotate in opposite directions downward at their oppositely disposed surfaces; means for rotatably securing said rolls to said cornpicker; and means for causing said rolls to rotate in opposite directions downward at their oppositely disposed surfaces.

"2. The combination of claim 1 in which the lugs of each of said rolls are each provided with a rounded surface on that longitudinal side thereof which is disposed in the direction of rotation.

"3. The combination of claim 1 in which the ridges on each roll are two in number and the lugs on each roll are four in number.

"4. The combination of claim 1 in which the lugs of each of said rolls are intermeshed in operation.

"5. The combination of claim 1 in which the convolutions of said helical ridges are spaced progressively farther apart toward the rearward end of the rolls, and in which said rolls are each circular cross section, tapering progressively from smaller diameters at their forward ends to larger diameters at their rearward ends.

"6. As an article of manufacture, a roll for a corn picker having a helically winding outstanding ridge extending to a point spaced apart from one end of said roll, said ridge having a normally leading edge; a plurality of equidistantly spaced apart longitudinal lugs disposed at said one end, said ridge terminating in such position that said leading edge terminates between two adjacent ones of said lugs.

"7. As an article of manufacture, a roll for a corn picker having a helically winding outstanding ridge extending to a point spaced apart from one end of said roll, said ridge having a normally leading edge; a plurality of equidistantly spaced apart longitudinal lugs disposed at said one end, said ridge terminating in such position that said leading edge terminates approximately midway between two adjacent ones of said lugs."

2. Claims of Shrader patent "B":

"1. In a pair of snapping rolls for a corn picker, the combination which comprises, juxta-positioned similar cylindrical members providing the rolls, the diameters of the leading ends of which are less than the diameters of the trailing ends. The peripheral surfaces of each of said rolls being provided with a plurality of circumferentially spaced coacting

English, each of them describes a correlated pair of rolls for attachment and use upon a mechanical corn harvester.[3] In actual employment such a harvester, usually treating two corn rows concurrently, moves at a fairly constant rate of speed, ordinarily under petroleum products power, along the entire course of the corn row subjected to its operation. By means of two appropriately spaced flaring panels of sheet metal material forming a narrow corridor with widened forward elements, whose lower margin is adjusted near to, but safely above, the ground, the corn stalks within each separate row are collected and pressed somewhat together and, along a progressively narrowing passage way, channeled, still standing and affixed to the soil, into an activated mechanism, of which the rolls are essential, though not the only parts. An important unit in that mechanism, not involved in the patents, is a pair of parallel endless chains arranged one at either side of the metal channel with attached metallic fingers projecting from the chains into the channel which, moving at equal speed in the direction opposite to that of the forward progress of the whole machine, through the instrumentality of those fingers engage the stalks and tend to press them gradually to the rear of the harvester and into and through its snapping and husking elements.

That snapping and husking machinery is mounted on two steel bars of equal length affixed substantially parallel to and a few inches from each other, with their forward ends placed several inches rearward from the front ends of the flaring sheet metal collecting section and also near to the ground, and their rear ends elevated to make the rearward slope of each of the two parallel bars about thirty degrees upward from the horizontal plane.

These two bars or rods are so made and disposed that they respectively pass through tubular rolls, sometimes partly of rubber material but otherwise and generally of metallic character. The tubular rolls may consist of a single complete roll for each carrying rod, or they may consist of an assembly of separate sections selected and arranged to conform to the owner's judgment of the most efficient devices for his individual fields of corn. In actual use of the harvester the rolls, under the impulse of power transmitted through gears, revolve at like speed in opposite directions, each inwardly and downwardly, and, with their several projecting devices, infra, tend to draw each corn stalk rearwardly and downwardly and to remove its ears and denude it of its husks. It is only for complementing rolls of this character usable on harvesters made by different manufacturers that the Shrader patents are conceived. Such rolls, of whatever detail in design, including the Shrader rolls, are claimed to accomplish their purposes by the broadly similar, though somewhat variant, traumatization of the corn stalk, the

helical ridges, said ridges extended from the leading ends of the rolls to points spaced beyond the midway sections thereof, a plurality of spaced parallel longitudinally disposed elongated lugs extended from the ends of said ridges, and spirally disposed ribs extended between the ends of the said lugs and the trailing ends of the rolls, said ribs extended in a direction opposite to that of the said helical ridges.

"2. In a pair of snapping rolls for a corn picker, the combination which comprises, juxta-positioned similar cylindrical members providing the rolls, the diameters of the leading ends of which are less than the diameters of the trailing ends, the peripheral surfaces of each of said rolls being provided with a plurality of circumferentially spaced coacting helical ridges, said ridges extended from the leading ends of the rolls to points spaced beyond the midway sections thereof, a plurality of spaced parallel longitudinally disposed elongated lugs extended from the ends of said ridges, with the ends of the ridges terminating at points between the lugs, and spirally disposed ribs extended between the ends of the said lugs and the trailing ends of the rolls, said ribs extended in a direction opposite to that of the said helical ridges."

3. The court acknowledges, too, that it has been aided in its understanding of the descriptions by the cuts preserved in the patents, by the physical exhibits representing the manufactured rolls within the contemplation of the Shrader patents, which are also brought into the present record as parts of conveniently assembled photographic exhibits, and also by the oral testimony of sundry witnesses

ear shank and, on ripe corn, eventually the husks as the stalk proceeds through the mechanism.

The rolls envisioned in Shrader Patent "A" are basically two heavy cast iron cylindrical tubes, whose outside circumferences exclusive of their protuberances are substantially smaller at their forward ends. They are about twenty-five inches in length. Proceeding from the forward or smaller end of each of them are two equally spaced ridges, each with rounded surface on its side in the direction of its operating rotation, which wind spirally upward around the tubes with progressively widening intervals between the ridges until they terminate about seven inches from the rear and upper end of the tube. Commencing at this distance from that end of the tube, four equally spaced cast ridges, also with rounded surfaces on their sides in the direction of operating rotation commence, which extend longitudinally along the tube for the remainder of its length. The upper terminus of each of the spiral ridges is spaced about midway between two of the longitudinal ridges. The directions of those spiral formations are reversed as between the two rolls in the pair and they and the longitudinal ridges are so devised that they mesh as they rotate in operation.

Shrader Patent "B" contemplates a roll similar to that within the thought of Patent "A" except that the longitudinal ridges do not proceed from their point of origin as above indicated all the way to the upper or rear end of the tube, but rather proceed to a point about two inches from the upper end of the roll, from which, changing from their shape with rounded forward surface into a lug or ridge in the shape of an isosceles triangle based on the roll, they turn spirally in a direction opposite to the course of the forward spirals and extend to the end of the roll. The roll with all of its ridges or lugs is cast from molten iron in a single operation from a pattern and is a heavy rugged object.

Notice is taken also of the evident distinction between claims 1 and 2 of the Shrader Patent "B" (see footnote 2 for exact copy thereof) which results from the introduction into claim 2 of the phrase "with the ends of the ridges terminating at points between the lugs", by which alone it is differentiated from claim 1. It will be observed that, in the course of the prosecution of the proceeding to obtain Patent "A", after a preliminary rejection of the application on the basis of the earlier Jochumsen patent No. 2,293,757, infra, language, evidently in the way of a limitation, to the substantial effect of the quoted phrase was inserted into each claim either expressly or by reference; whereupon Patent "A" was granted. It is left somewhat uncertain whether the omission of the same material from claim 1 of Patent "B" was designated to free Patent "B" either entirely or optionally from the restriction reflected in the quoted language and made in each claim of Patent "A". Upon the submission of the case counsel for the plaintiffs place emphasis upon the breach in continuity between the forward spiral ridges and longitudinal lugs in their support of the departure of both patents from the prior art, but remind the court of the unlimited language of claim 1 of Patent "B" when arguing in support of their claim of infringement by the accused device whose two spiral ridges merge into two of its four longitudinal lugs. Generally and practically, however, their emphasis throughout the case has been upon the feature of discontinuity at that point. And it is reflected also in their finished rolls as exhibits upon the trial.

In field employment, the rolls with their forward ridges first engage or grasp the corn stalk and, by the spiral arrangement of the ridges and the rapid complemental rotation of the entire rolls, aided by the moving chain fingers and the forward motion of the whole machine, force the stalk to the rear and downward. This downward motion is sharply accentuated when the stalk reaches the longitudinal lugs, in and by which the greater number of the ears are wrenched from the stalks. Of course, it is obvious that this snapping operation may occur in practice at any point in the stalk's progress along the rolls at which the ear shank is brought in contact with the violent blows of the projections from the moving elements. So, the height of the ear on

the stalk is inevitably a factor in determining precisely where it will be removed. But for the generality of ears the snapping sector is, probably and by design, in the area of the longitudinal ridges. The declared and practical purpose of the short reverse spiral lug section is to prevent the accumulation of refuse and trash at the upper end of the roll by repelling any residue of stalks and husks back into the longitudinal lug section for further encounter with, and desired elimination by, rapidly downward moving lugs.

For their rolls the plaintiffs claim the virtue of accomplishing in a single roll section of a corn harvester the complete snapping and husking of ripe dry corn[4] without the addition of special husking rolls or the use of a separate husking bed. The practical vindication of that claim may not be said to have been accomplished with certainty in the proofs, but neither is it convincingly disproved. And the court does not regard its establishment as necessary for the purposes of this ruling.[5] In any event, the Shrader roll is so designed in length and type that one operating a corn picker might either use a pair of such rolls alone, or, if his steel bar or shaft were long enough, supplement them with other and additional units placed at their rear ends to suit his needs and preference.

Against the plaintiffs' alleged invention the defendant, in the way of prior art advances some seventeen antecedent patents, besides one not pleaded but cited as a reference in the proceedings in the patent office leading up to Patent "A". To the extent of the acknowledged limits of the trial judge's capacity in the field, all of these patents have been examined and considered. Not all of them need be discussed at length; and a few may be passed over without mention. Some of them, however, require brief reference and explanation

There are, by way of repetitive summary, three distinct phases of the Shrader roll, as it is made within the thoughts of Patents "A" and "B". These are (a) the initial two spiral ridges or lugs with their diminishing pitch designed primarily to move the stalk downward and to the rear, (b) the four longitudinal lugs or ridges made chiefly and in the ideal situation to snap and husk the ears and expel the stalk downward from the machine, and (c) the four short reverse triangular spiral ridges proceeding in altered structure from the four longitudinal ridges, installed for the purpose of preventing the accumulation of trash by casting it back upon the moving longitudinal lugs.

The court considers that there is neither invention nor novelty in the mere inclusion of all three of those phases or sections in a single casting, as distinguished from the employment of separate units or sections for the same eventual purpose. In point of fact, most, though not all, of the earlier patents have to do with the union of the several phases of which they treat in a single appliance[6] rather than with an assembly of distinct parts.

The court is persuaded that each of the essential features of the Shrader patents and all of them in combination and in identical sequence, are demonstrably present in at least two patents among those put forth by the defendant.

The earliest of those two patents is Philip, No. 135,841, issued in 1873 and covering a stationary hand powered corn husker for employment upon corn cut in the field and transported to the husker usually after standing in shocks. The following excerpts are taken from the specification of that patent:

> " * * * My improvement consists, first, in constructing a pair of picking-rolls, having spiral grooves and

---

4. It is granted that they only snap green corn and do not husk it.

5. The writer is disposed to think that a load of ear corn subjected to no treatment beyond that within the bestowal of such a pair of rolls would hardly rival in cleanness the product of the toil of a human husker of a half century ago.

Having said which, he hurries on, aware that he has convicted himself as a reactionary devotee of a forsaken rite, and not altogether repentant of the misdeed.

6. Recognizing, of course that they all deal with pairs of cooperatively working rolls, and none contemplates a single roll.

elevations, such as described in my Letters Patent of August 9, A. D. 1870, with reverse grooves and elevations at the end where the stalks are discharged.

"In practicing my invention set forth in the above-mentioned Letters Patent it was found that long stalks would be fed laterally to the end of the rolls and clog the journals and bearings, and to avoid this is the object of the reverse grooves and elevations. Between the right-handed and left-handed grooves and elevations are formed several annular grooves and elevations in order to give ample space for clearing the rolls of the stalks .* * *.

"The picking-rolls A B are provided with spiral grooves and elevations of gradually lessening pitch, as described in my patent of August 9, A. D. 1870; but, instead of extending to the discharge-end of the rolls, they terminate some distance from it; and beyond them the rolls are constructed, first, with several annular grooves and elevations $A^1$ $B^1$, and near the extreme end with spiral grooves and elevations $A^2$ $B^2$, running in a reverse direction, as clearly shown in Fig. 2. Did the left-handed and right-handed spiral grooves and elevations meet, the space through which all the stalks must then be discharged would be so contracted as to endanger the choking of the rolls at that point. This difficulty is met by the provision of the annular grooves and elevations $A^1$ $B^1$. These rolls are also provided with longitudinal ribs and corresponding grooves to insure the removal of the ears from the stalks * * *."

And this quotation is made from the patentee's statement of his claim:

"1. The picking-rolls constructed with annular grooves and elevations $A^1$ $B^1$ and spiral grooves and elevations $A^2$ $B^2$, running in a direction reverse to the spiral grooves and elevations

upon the main portion of the rolls, substantially as and for the purposes specified."

The graphic cuts also forming a part of that patent emphasize the essential identity of the Philip patent with the vital features of the final Shrader patent. Each has two complementing rolls positioned and operating parallel to each other. Each roll has forward spiral ridges meshing in operation, by which the processed stalks are moved rearwardly. The Philip roll also has meshing longitudinal elevations and grooves along its entire length designed to cooperate in the downward movement of the stalk. Those elevations and grooves are present in a second and short section in which they cooperate with annular ridges perpendicular to the length of the roll. Finally, the Philip patent discloses the reverse spiral ridge which is emphasized in Shrader Patent "B" and in the actual rolls made within its thought.

The court is satisfied, therefore, that, even before the introduction of moving and power driven husking machines for use upon standing and uncut corn, all of the vital features of the Shrader patent were covered in and by the Philip patent.

And, with variations essentially immaterial, the critical features of the Shrader patents inclusive of Patent "B" are found in Blank Patent 2,252,159 issued in 1940.[7] The forward spiral ridges are present in Blank's roll. Of them Blank declares:

"The spiral portions of the rollers just described effect guiding of the stalks rearwardly between the rollers and occupy a major portion of the length of the rollers."

In his drawings displayed in the patent he shows six distinct ridges; but he explicitly states that such number is no vital matter and that the ridges may be greater or fewer in number than six.

The two sections of the Blank roll comparable to the longitudinal ridge and reverse spiral phases of the roll within the

---

7. To Blank also Patent No. 2,178,013 was issued in 1938. His later patent appears really to be a claimed improvement upon the earlier one.

Shrader patents are described thus by Blank:

"A short minor portion of the rollers at their upper ends is formed as a feeding section 25 which will rapidly feed the upper ends of the stalks downwardly between the rolls. Any ears on the upper ends of the stalks will of course be removed thereby. This feeding section is preferably composed of ribs which may be extensions of the ribs 23 which, for the purpose of feeding, are curved into a reverse spiral. There are provided in feeding section 25 supplementary ribs 26 between the ribs 23 which together produce a rough feeding surface but of sufficient continuity to prevent this section from gripping the end of an ear of corn and shelling such end."

From that language and the pertinent illustrative drawings it is made clear that in the Blank roll what corresponds to Shrader's longitudinal lug section is a segment in which the forward spiral ridges, interspersed in this area with other ridges newly constructed at that point, proceed in an elongated and somewhat elliptical curve and eventually turn into a second short spiral section, in direction opposite to the forward spiral ridges, and in that form extend to the end of the roll. Thus, the elliptical ridges are not, as are the Shrader longitudinal lugs, arranged in straight lines. But their purpose and function are identical with the comparable phase of the Shrader rolls, in the accomplishment of which the court finds no essential distinction between the shapes of the lugs as straight or elliptically curved. And the reverse spiral ridges are unmistakably present in the Blank appliance and patent. The claims of the Blank patent are largely set out in a footnote.[8]

The court considers that the Shrader patents, inclusive of Patent "B", are in-

---

8. The claims of Blank Patent No. 2,252,-159, in part, follow:

"1. In a corn picker, the combination comprising a pair of cooperating snapping rollers both of said rollers being provided with a plurality of substantially continuous spiral ribs extending from portions adjacent the upper rearward ends of the rollers to points adjacent to lower front ends of the rollers, the ribs on said rollers being spiraled in opposite directions and the spirals on the two rollers having substantially the same pitch, said spiral ribs defining channels therebetween, which channels are substantially free of obstructions, the channels on the adjacent sides of the rollers being complemental and generally vertical, said ribs effecting guiding of stalks rearwardly between the rollers, and means projecting from the faces of the rollers at the upper rearward ends thereof for feeding stalks downwardly between the rollers, said means comprising continuations of said ribs curved in the opposite direction from the main part thereof whereby to prevent the stalks from being fed beyond the ends of the rollers.

2. In a corn picker, the combination comprising a pair of cooperating snapping rollers, said rollers including means extending throughout the major portion of the length thereof for guiding stalks rearwardly therebetween, means for rotating said rollers whereby to effect guiding action by said rollers, said means rotating said rollers effecting rotation at a rate proportioned to the rate of guiding movement sufficient that the rollers rub in a downward direction on stalks therebetween, said rollers in the extent of said guiding means being free of obstructions which would cause feeding of the stalks therebetween and means at the upper rearward ends of the rollers for effecting feeding of stalks downwardly between the rollers, said feeding means comprising extensions of said guiding means curved in a reverse direction from the major portion of the length of the guiding means whereby to tend to cause feeding of stalks in a reverse direction.

"3. In a corn picker of the type having a pair of inclined rollers positioned side by side to which standing stalks of corn are fed by movement of the picker in a field, and in which the rollers are rotated in a direction such that the adjacent sides thereof move downwardly, characterized by the rollers being provided with spiral guiding means extending throughout the major portion of the length of the rollers to guide stalks fed therebetween rearwardly between the rollers upon rotation thereof and being free of obstructions in the extent of said guiding means which might effect feeding of stalks downwardly therebetween, said rollers being rotated at a rate to guide stalks rearwardly at a rate generally equal to the rate

distinguishable in practical consequence and in principle from the Blank patent. And that is especially true when regard is had to the complete lack of novelty in the use and placement of longitudinal lugs on such appliances, infra.

It may be said briefly, and without detailed analysis of the many patents before the court, that there can be no possible invention in Shrader's use of his leading section of spiral lugs. That feature is common to nearly all of the devices at which the several patents aim. It is quite true that as between them variety is reflected in the number of lugs; their pitch; the inclusion upon, or absence from, them of supplemental or auxiliary metallic projections; and, in some instances, the departure from regularity of the spiral course of the lugs. But those are matters of detail not of substance. They are evoked by mechanical application, not by invention.

Nor does the longitudinal ridge section present any novelty. Such sections, materially indistinguishable from those disclosed in the Shrader patents, are embodied in earlier patents identified as Stone, 786,239 and 899,142; Goodhue, 839,472; Clouser, 1,014,812; Hughes, 1,373,428; Malmberg, 1,561,338; Schuld, 1,647,936; Paradise, 1,682,143; Keeler, 1,736,347; Synck, 1,827,-216; Everett, 1,940,851; Fitzloff, 2,315,950; and Jochumsen, 2,293,757 [9]; besides the Philip and Blank patents already discussed at some length.

At this point note should be taken of the claim of invention in the Shrader patents, first made in pursuit of Patent "A", and reiterated in claim 2 of Patent "B" by virtue of the breach between the trailing ends of the forward spiral ridges and the longitudinal lugs. As has been noted those two spiral ridges in the Shrader patents and machine are no part of any of the lon-gitudinal lugs [10], but rather terminate at approximately the level on the roll at which the longitudinal rolls commence and between the separate pairs of the latter. That discontinuity involves no invention. It is observable, with varying detail in the Synck, Hughes and Malmberg patents, and with high probability in the Keeler patent, and, as to part of the short rear end lugs, in the Blank patent. Besides, this court has found it impossible to attribute any practical virtue or creative significance to that item.[11]

Similarly, the court can perceive no inventive feature or distinction in the rounding of the forward moving edge of the primary spiral and longitudinal lugs in the Shrader patents.

Lastly, the short reverse spiral lug section of Patent "B" is clearly reflected, as has already been suggested, in the Philip patent and in both of the Blank patents.

It is readily understood that the granting of a patent gives rise to a presumption of its validity, including the qualities of novelty and utility. Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983; Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163; Dean Rubber Manufacturing Co. v. Killian, 8 Cir., 106 F.2d 316, certiorari denied 308 U.S. 624, 60 S.Ct. 380, 84 L.Ed. 521; Strong-Scott Manufacturing Co. v. Weller, 8 Cir., 112 F.2d 389. In the face of that presumption the burden of establishing invalidity is cast upon an alleged infringer who resorts by way of defense to the invalidity of a patent otherwise regularly issued. In determining whether he has sustained that burden every reasonable doubt is to be resolved against him. Radio Corporation of America v. Radio Engi-

of forward movement of the picker in the field, said rollers being provided upon their rear end portions with complemental similar means tending to reverse the direction of travel of the stalks between the rollers."

9. Cited as a reference in the Patent Office in the progress therein of Patent "A".

10. Except to the extent that the lack of continuity between them is omitted from Claim 1 of Patent "B".

11. And it need hardly be said that to the extent that Claim 1 of Patent "B" omits the factor of discontinuity and extends to a device in which the spiral ridges merge into two of the horizontal lugs, that unbroken course is the rule rather than the exception in the earlier patents.

neering Laboratories, supra; Strong-Scott Manufacturing Co. v. Weller, supra.

Recognition is also given to the rule that the presumption of validity arising from the issuance of a patent is given added support by the record of the consideration in the process of its allowance of the closely similar prior references, Gulf Smokeless Coal Co. v. Sutton, Steele & Steele, 4 Cir., 35 F.2d 433, but impaired in proportion as such prior patents appear not to have been so considered. O'Leary v. Liggett Drug Co., 6 Cir., 150 F.2d 656. It is to be noted that neither the Philip patent nor the particular Blank patent especially examined herein was cited in the course of either of the two Shrader patent proceedings.

The court on this occasion has had clearly in view the existence of the presumption of validity and the incidence and austerity of the burden of proof. But it has shortly to be stated that, in the court's appraisal of the evidence, the burden has been successfully carried and the presumption has been overcome. In reaching that conclusion the court has not neglected the support of the presumption of invention which arises from the virtual identity of the accused device with appliances made under the plaintiffs' patents. Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527; Linville v. Milberger, 10 Cir., 29 F.2d. 610. Even so, the persuasive force of the earlier patents may not be disregarded in this case.

It is true also, as the plaintiffs argue, that patentability attaches to a new combination of old elements whereby a new and useful result is produced or an old result is attained in a more facile, economical and efficient way. National Hollow Brake Beam Co. v. Interchangeable Brake-Beam Co., 8 Cir., 106 F. 693; Denning Wire & Fence Co. v. American Steel & Wire Co., 8 Cir., 169 F. 793. However, the court is persuaded by the record before it that the combination of earlier elements reflected in the Shrader patents, whether those patents be considered together or separately is not new, but rather old and familiar. Not only each of the elements, but also the combination is old. Moreover, the court is equally satisfied that the combination thus made neither produces a new result nor accomplishes an old result more easily, economically or efficiently. It follows that no premise for the invocation of that rule is present.

Besides the prior patents exhibited in evidence upon the trial, it was satisfactorily shown, and is found by the court, that for several years before the initiation by Shrader of any study or work associated with his patents, separate tubular sections were advertised, offered and available on the market for assembly in optional order sequence and grouping into husking rolls. Among these sections were units severally providing, (a) spiral lug segments in varying degrees of pitch, (b) longitudinal lug segments, and (c) reverse spiral segments. Also available were a good many other sections both in metal and in rubber, all for use as customers might prefer or their needs require.

Among the machines for which such assembled rolls were made available was the so-called "Soilfitter"-Kuhlman corn picker originally manufactured by a corporation now and for many years defunct. After its liquidation the Schultz Company eventually succeeded to certain of its property and for about twelve years has provided repairs for the old machines yet operating which were made by the earlier concern. While the court does not consider that the evidence warrants a finding that prior to his work towards his patents Shrader knew of the actual and operative use on Soilfitter harvesters of husking roll assemblies containing in precise sequence a spiral lug section, a longitudinal lug section, and a reverse spiral section, it does find from the evidence that more than a year before the application for either of his patents they were so used, by at least one farmer in the state of Illinois. Evidence to that effect is before the court, and while it was produced by the Schultz Company in behalf of the defendant from the Schultz Company's remote neighborhood, and, on that account, must carry the burden of some suspicion, credibility is lent to it by

the demonstrated long continued availability to the public of the equipment for such an assembly. For that matter some support is also attributable to the testimony concerning such use in the plaintiffs' own evidence of the practical utility of such units in that sequence. Being available and useful, it is not difficult to believe testimony of their actual employment.

However, it is now made clear that the court does not premise its finding of invalidity in respect of the plaintiffs' patents on the prior use found and referred to in the last preceding paragraph. A single item of evidence upon the point was received upon the trial, and the court goes no farther than to signify its finding that that evidence was true. It may simply be observed that, if the invalidity of the patents in suit rested alone upon the somewhat tenuous incident reflected in that testimony, the subject would be scrutinized much more critically than has now seemed to be necessary.

The finding of want of invention already announced effectively disposes of the present action in the defendant's favor. It may be in order, however, for the court to make clear that if the plaintiffs' patents were considered to be valid, the court would find from the evidence that the rolls manufactured by the Schultz Company and sold by the defendant are infringing devices.

In the court's opinion no material distinction exists between the rolls made under the Shrader patents and those manufactured by Schultz. In size, shape and general structure they are virtually identical. So are they in their component sections and their sequential arrangement and even in the relative lengths of such sections, severally regarded. No material difference exists in the longitudinal spaces between the several spiral lugs in the forward sections of the two devices. In each roll, the forward spiral lugs are two in number, the longitudinal lugs terminating in the reverse spirals four.

Two possible, but in the court's appraisal trivial, differences between the items may be noted. One is a somewhat sharper forward edge in the Schultz' spiral and longitudinal ridges. The other is the fact that in the Schultz rolls the spiral ridges are contained in two of the longitudinal ridges and on through two of the reverse spirals. But enough has been said on the subject of lack of invention in the Shrader patents to make clear the position of the court that these differences are immaterial. In one setting they are inadequate to avert from the Shrader patent the consequence of lack of invention. In another they can not save the Schultz rolls from the odium of essential identity with those of Shrader.[12] Knapp v. Morss, 150 U.S. 221, 14 S.Ct. 81, 37 L.Ed. 1059; Peters v. Active Manufacturing Co., C.C.Ohio, 21 F. 319; Kil-Nock Co. v. Chicago Plating Co., D.C.Ill., 10 F.2d 536; Penmac Corporation v. Esterbrook Steel Pen Mfg. Co., 2 Cir., 108 F.2d 695; Kalle & Co. v. Multazo Co., 6 Cir., 109 F.2d 321.

Then, too, some of the history which the evidence fairly reflects fortifies the conclusion that, in the appraisal of its course least critical of it, the Schultz Company was at no pains to avoid essential duplication of the Shrader rolls.

Shrader is a farmer living near Ravenna, Nebraska. Late in 1945 he bought a used Kuhlman corn picker. Through the next approximately three years he experimented in his actual corn harvesting operations with various improvised rolls (in substitution for those on the machine when he acquired it) which he devised, using automobile parts for the basic cylinders and welding metallic ribs to their outer sides. In that experimentation he made changes from time to time in the rolls with which he was making his studies, developing in all some three rolls through about three years.

12. Then, too, attention is again given to the omission from Claim 1 of Patent "B" of the feature of want of continuity between the forward spiral ridges and any of the longitudinal lugs. To the extent of that omission, that patent ostensibly allows the persistence of the spiral ridges into two of the longitudinal lugs. And on that supposition the accused device still further conforms to the patent, as distinguished from its conformity to the Shrader rolls as manufactured devices.

Eventually, and on the dates already indicated he obtained the two patents.

In the Spring of 1949, one Herrmann, a sales representative of the Schultz Company called on Shrader and discussed the experiments Shrader was conducting with his rolls. He came back early in April of that year and observed Shrader's use in the actual harvesting of some corn of those of his rolls which he was then employing, and expressed an interest in them.

Later some correspondence ensued between Sturges, in behalf of both plaintiffs, on the one hand, and the Schultz Company, on the other, in the course of which by prearrangement, the two plaintiffs being on a business trip taking them through the near neighborhood of Rochelle, Illinois, on December 17, 1949 called at the offices of the Schultz Company. They had with them a pair of the regularly cast Shrader rolls. While there they talked about the rolls with Herrmann, and with L. H. Schultz, the executive head of the Schultz Company, as well as with other men in the Schultz organization, exhibited to several of its officers and employees moving pictures of the Shrader rolls in operation, and also displayed the rolls and left them at the Schultz offices with the understanding that the Schultz Company would test them in an actual corn picking operation at an early date. The plaintiffs then proceeded on their journey.

Thereafter, further correspondence by mail and communication by telephone occurred between Sturges and the Schultz Company. In its course discussion was had, but without agreement, of a possible arrangement for the manufacture by the Schultz Company of the Shrader rolls upon a basis of compensation to the plaintiffs mutually acceptable to them and to the Schultz Company. Finally, the Schultz Company advised Sturges that it did not regard the Shrader patents favorably and proposed to manufacture rolls of its own without regard to them. It was then or shortly thereafter that rolls identical with the accused rolls were produced and marketed by the Schultz Company.

In that setting, the essential identity between the Schultz and Shrader rolls is especially significant. However, the conclusion that the Shrader patents are invalid intercepts the allowance of the relief sought by the plaintiffs against the action of the defendant, either contemplated or accomplished.

An order of dismissal is being entered in which provision is made for the taxation of costs against the plaintiffs. This naturally renders unnecessary any formal ruling on the defendant's motion for dismissal made at the close of the plaintiffs' evidence.

And without further formal action, the court also adheres, partly for untimeliness, partly because of the failure to renew the motion, and partly because of the nature of the ruling now formally announced, to its ruling in the course of the trial denying a motion then made by the plaintiffs for the inclusion of the Schultz Company as a defendant.